IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | | |
|---|---|---|
| In re: | * | Bankruptcy No. |
| David Reecher | | 11-30365-DER |
| Debtor | * | Chapter 7 |

_____

| | | |
|---|---|---|
| Plaintiff | * | Adversary No.: 12-00061 |
| Daisy Couloote Phillip | | Judge: David E. Rice |
| | * | |
| Defendant | | |
| David A. Reecher | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### PLAINTIFF'S POST-TRIAL LEGAL MEMORANDUM

**I.      INTRODUCTION**

Plaintiff Daisy Couloote Phillip, in the seven day trial on the merits of her Complaint to Determine Dischargeability of Debt, has proven the facts required by law to determine that Defendant's judgment debt to Plaintiff be deemed non-dischargeable in bankruptcy.

**II.     WHAT PLAINTIFF MUST SHOW TO SATISFY THE STANDARD FOR NON-DISCHARGEABILITY UNDER § 523(a)(2)(A).**

The 1898 Bankruptcy Act exempted from discharge "judgments sounding in fraud," embodying the necessary policy of the Bankruptcy Code to restrict its grant of new financial beginnings *only to the* "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87, 290 (1991). The latest iteration of this unchanging principle is found in section 523(a)(2)(A) of the Bankruptcy Code, which excepts from discharge in bankruptcy "any debt … for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by … false pretenses, a false representation, or actual fraud." 11 U. S. C. § 523(a)(2)(A).

In *Cohen v. de la Cruz*, the Supreme Court held that "that § 523(a)(2)(A) prevents the discharge of *all liability arising from fraud* and that an award of treble damages therefore falls

within the scope of the exception." 523 U.S. 213, 215 (1998). *Cohen* also provided guidance on the terminology and operation of §523(a)(2)(A) holding that:

> [T]he phrase "to the extent obtained by" in § 523(a)(2)(A), as the Court of Appeals recognized, *does not impose any limitation on the extent to which "any debt" arising from fraud is excepted from discharge*. . . . The phrase thereby makes clear that the share of money, property, etc., that is obtained by fraud gives rise to a nondischargeable debt. ***Once it is established that specific money or property has been obtained by fraud, however, "any debt" arising therefrom is excepted from discharge.***
>
> \*     \*     \*
>
> It is clear that "debt for" in that provision [referencing § 523(a)(9)] means "debt arising from" or "debt on account of," and it follows that "debt for" has the same meaning in § 523(a)(2)(A). When construed in the context of the statute as a whole, then, ***§ 523(a)(2)(A) is best read to prohibit the discharge of any liability arising from a debtor's fraudulent acquisition of money, property, etc.,*** including an award of treble damages for the fraud*.

*Cohen v. de la Cruz*, 523 U.S. 213, 218-19, 221-22 (1998) (emphasis supplied).

The burden of proof upon the Plaintiff to make such a showing of fraud under 11 U. S. C. § 523(a) is the ordinary preponderance-of-the-evidence standard, the lowest possible standard of proof in civil or criminal trials. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). "The burden of showing something by a preponderance of the evidence, the most common standard in the civil law, simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence[.]" *Concrete Pipe & Prod. of Cal., Inc. v. Const. Laborers Pens. Trust*, 508 U.S. 602 (1993) (internal quotations and citations omitted).

To show "false pretenses, a false representation, or actual fraud" under § 523(a)(2)(A), a Plaintiff must establish :

> (1) that the debtor made a representation; (2) that at the time the debtor knew the representation was false; (3) that the debtor made the representation with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representation; and (5) that the creditor sustained loss and damage as the proximate result of the representation.

*In re Freeland*, 360 B.R. 108, 122 (2006) (internal citation omitted).

Therefore, the burden is upon the Plaintiff to show by a preponderance of the evidence that the Debtor, Defendant David Reecher ("Reecher"), obtained money or specific property from Plaintiff through fraud, and that the judgment debt owed by Reecher to Plaintiff *"arose"* out of this fraud. Plaintiff submits that in her seven day trial, she has more than sufficiently met her burden.

### III.   UNDER MARYLAND LAW, DAVID REECHER IS LIABLE TO PLAINTIFF FOR THE ACTS OF HIS AGENTS AND EMPLOYEES, INCLUDING ERIC GOLDEN.

#### a. Eric Golden's representations on behalf of debtor and his company toward Plaintiff easily satisfy the required elements of § 523(a)(2)(A).

Defendant has made the argument that he cannot be liable for defrauding Plaintiff because he "never even met" the Plaintiff until her deposition in this case.  Contrary to Defendant's unsubstantiated argument, Reecher didn't have to meet Plaintiff to be liable, as Maryland agency law holds that Defendant's position as President and sole shareholder of Landco Investments, Inc. (hereafter, "Landco") makes him responsible for the acts of his agents and employees within the scope of their employment.

Testimony through Defendant and his employees has shown that Eric Golden (hereafter, "Golden") made numerous misrepresentations to Plaintiff, namely that he would list her home for around $350,000.00 and upon selling her home, his company would receive a commission of the sales price and the money spent in *authorized improvements*, namely to patch a cement crack, knocking down a wall in the kitchen and painting.  In fact Reecher testified that he signed a listing agreement with his own company 1,2,3 For Real Estate, LLC, whom Golden was an equal partner, on or about May 2, 2007 listing Plaintiff's home for $319,700.00, approximately a day after Plaintiff left her house for a "quick sale" as represented by Golden and prior to any alleged renovations. (DCP 250-265.) Thus the first § 523(a)(2)(A) element, requiring a representation to

3

be made, is satisfied.

The second element requires that, *at the time the statement was made, the person making the statement knew that it was not true*. This was clearly shown at trial by the fact that contemporaneous to making the statements, Golden was instructing Plaintiff to sign, but not date, various documents, whose operative terms would be filled in later, outside of her presence, and that her signature would be dated to match the appropriate time for her signature in the step-transaction utilized by Defendant, likely for tax evasion purposes and to further support the fraud through concealment of the true dates of the transaction.[1] At the time of making such statements, Golden knew that these documents would be used to transfer the title to her home to Landco, and were not agreements for listing the property and giving a commission to Landco. He also knew that he would be filling in the documents, after she signed it, in a manner which would be inconsistent with the statements made to her on that date in late April. This practice was approved with Defendant's knowledge and consent as is evident by his testimony that the other seventeen (17) transactions testified to by Mr. Reecher were completed utilizing the same procedure of back-dating the transactions. Thus, the second element, knowing at the time of making the representation that the representation was false, is met here.

The third element requires that the representation was made "*with the intention and purpose of deceiving the creditor[.]*" Although Golden did not show up to testify at this trial of his partner Reecher, there can be little doubt why he made such false statements to the Plaintiff. If he had told her that he was going to be organizing an LLC for the Plaintiff, naming Defendant as the resident agent, transferring title to her home into said LLC, and then transferring her full interest in the LLC to Landco for $10.00, she wouldn't have signed the documents. It would be

---

[1] The transactional documents signed by Plaintiff had at least five different dates as evidenced by the various documents filled in by employees of Reecher under his guidance and supervision.

difficult, if not impossible, to believe the false representation was simply a slip of the tongue on the part of Golden.  The facts and circumstances which have come out at trial unequivocally show that the only logical reason such a statement would be made would be to induce the Plaintiff into signing the blank documents that would be used to fraudulently transfer her interest in her home to the Defendant.  Therefore, the element referencing the intention and purpose to deceive is surely met under these circumstances.

The fourth element requires that "*the creditor relied on such representations[.]*"  For this element, the level of reliance that must be shown is the more relaxed standard of *justifiable* reliance, not reasonable reliance.  *See In re Cramblitt,* Bk. No. 09-20324DK, Adv. No. 09-00610DK (Bankr. D. Md. 2010) (citing *Field v. Mans*, 516 U.S. 59, 61, 116 S.Ct. 437, 439 (1995)).  This type of reliance holds that "a person is justified in relying on a representation of fact although [s]he might have ascertained the falsity of the representation had he made an investigation." *Id.* (citing, *inter alia*, the RESTATEMENT (SECOND) OF TORTS § 545A, *comment b*).  Further, the determination of justification "relies upon the characteristics of the particular plaintiff and the circumstances of the particular case." *Id.*

The characteristics of the Plaintiff and the totality of circumstances of the case have been shown at trial.  Plaintiff was a high school educated full-time working mother who transported handicapped children for a living.  She was selling her home for the first time in her life when she made that fateful call to Chesapeake Home Buyers in April of 2007.  She has acknowledged that she is not sophisticated in the realm of real estate transactions or complex business transactions.  Golden arrived at Plaintiff's home armed with a packet of blank documents (the instruments of fraud), identified himself as being with Chesapeake Homebuyers, was dressed in a Chesapeake Homebuyers shirt, and carried with him a Chesapeake Homebuyers business card.

5

Plaintiff testified that on the day Golden came to her house in April, 2013, he was "full of energy" and "showed [her] so much love." He told her that "everything looks good" and that he just needed to knock down a wall, fix a hole in the foundation, and paint the house. She was excited about dealing with Golden. He came off as a professional, and it has been shown at trial that it was always Golden's role, and Golden's alone, to be the individual who procured the homeowner's signatures on behalf of Landco. There can be no doubt that Golden was chosen for this exclusive role by Reecher for his ability to persuade in such circumstances.

     Plaintiff testified that later on after moving into an apartment, she drove by her home at 5444 Taylor Street, and saw a "For Sale" sign in the yard, which reassured her that everything was proceeding as promised by Landco. The fact that the Defendant had been named as resident agent of the newly created 5444 Taylor Street, LLC prevented her from receiving any correspondence from SDAT that would alert her to the fact that an LLC had been created in her name, something which she had never been told about or agreed to. (*See* Plaintiff's Exhibit 37.) Plaintiff also testified that her contact with Golden, became increasingly difficult to reach and evasive once her home was sold in November of 2007. Later on, in early 2008 Golden also made additional promises to give Plaintiff $1,000.00 a week, until the housing market picked up, when he would be able to provide her with the whole amount he owed her from the sale. (*See* Plaintiff's Exhibit 20, DCP-347.) After only receiving one payment, which Defendant disingenuously claims was a payment for "*bird dog services*" despite the barrage of testimony from Lisa Lima, David Williamson, Gary Rand, and the Plaintiff, which casts doubt upon such a premise, Plaintiff decided to start her investigation by going to the land records office and with the aid of a court clerk who showed her the deeds and explained them to her, discovered that she had been the victim of a fraud. Thus these are the facts and circumstances which show that

Plaintiff *justifiably relied* on the representations of Golden acting as agent and partner of Defendant Reecher.

The fifth and final element necessary for Plaintiff to show is that she "*sustained loss and damage as the proximate result of the representation.*"[2]  However the actual dollar amount of her loss is ultimately calculated, Plaintiff suffered the loss of the equity in her home to which she was entitled.  There is little doubt that the misrepresentations which were made to Plaintiff were a "substantial factor" in causing her to suffer this loss, as they facilitated Plaintiff's signing of the blank documents which were used to defraud and swindle her out of her interest in her home.  Moreover, the required proximate or "legal causation" is clearly satisfied, as Plaintiff's loss could surely be foreseeable to Golden as the expected outcome of his misrepresentations, and he would surely "reasonably expect" her loss to occur as a result of relying on his false statements to her, which eventually occurred.  Thus, all elements of § 523(a)(2)(A) non-dischargeability have been satisfied, through Golden, who, although a co-debtor to Plaintiff on the $2,650,000.00 judgment, is not a party to this adversary proceeding, but was at all times acting under the auspices and control of Reecher and in furtherance of his interest and his companies.  Defendant had the opportunity to call Mr. Golden, and even listed him as a witness in his pre-trial statement, yet Defendant failed to put his partner on the witness stand to defend the very practices which he created and endorsed albeit fraudulently.  Having established  Golden's culpability and his concerted actions with Reecher, Plaintiff will now show the legal basis by which liability for Golden's fraud upon the Plaintiff is imputed to the Defendant, by virtue of the well-settled law of agency.

---

[2] Section 548A of the Restatement (Second) of Torts defines proximate cause as "(1) causation in fact, which requires a defendant's misrepresentations to be a `substantial factor in determining the course of conduct that results in [the plaintiff's] loss' . . . and (2) legal causation, which requires the plaintiff's loss to have been `reasonably expected to result from the reliance.'" *In re Grant*, 237 B.R. 97, 117 (Bankr. E.D. Va. 1999).

### b. The doctrine of Respondeat Superior applies to Defendant as an employer.

*Respondeat Superior*, or vicarious liability, is a principle of law which imputes liability to an employer for an employee's torts done within the scope of their employment, and thus imputes Golden's misrepresentations to the Defendant Reecher. In *Sanders v. Rowan*, the Maryland Court of Special Appeals held that:

> ***A principal is liable to third persons in a civil suit, for the frauds,*** *deceits, concealments, misrepresentations*, torts, negligences, and other malfeasances, or misfeasances, and omissions of duty, ***of his agent in the course of his employment, although the principal did not authorize, or justify, or participate in, or indeed know of such misconduct***, *or even if he forbade the acts or disapproved of them*. In all such cases the rule applies *respondeat superior;* and it is founded upon public policy and convenience; <u>for in no other way could there be any safety to third persons in their dealings,</u> either directly with the principal, or indirectly with him, through the instrumentality of agents. *In every such case the principal holds out his agent as competent and fit to be trusted, and thereby in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency.*

61 Md. App. 40, 54, 484 A.2d 1030 (1985) (quotations omitted; emphasis supplied); *see also*, *Tome v. Parkersburg R.R. Co.*, 39 Md. 36 (1873); STORY ON AGENCY §§ 452, 261 (1876).

Defendant was the sole principal, president and shareholder at Landco. Lisa Lima, David Williamson and Gary Rand all testified that Defendant was in charge of Landco and they referred to him as the "***boss***." Defendant's business headquarters and only office was located in the basement of his home where all employees worked together, and he testified that he had the ultimate authority as to whether or not to "accept" or "reject" a deal.[3]

Golden was an agent of the principal Reecher with Landco, and Golden was also an equal partner with Reecher in 1,2,3 For Realty, LLC, the brokerage service which they both owned and founded with their lawyers, which was the same company used by Defendant to list Plaintiff's

---

[3] By "accepting" a deal, he testified that a number of days after Landco received the signed packages from the homeowner, he would sign the "Standard Purchase and Sale Agreement" and backdate the "Date of Offer" to be the same date as the "Date of Acceptance." (*See, e.g.*, DCP-117, DCP-438, DCP-441, DCP-444, DCP-447, DCP-450, DCP-453, DCP-456, DCP-459 (undated by both buyer and seller, this practice is most questionable along with Defendant's backdating of the deed).)

home for sale. Regarding what is required in order to be deemed an agent, the Maryland Court of Appeals holds that "an agent is a person who represents another in contractual negotiations or transactions akin thereto." *Globe Indemnity Co. v. Victill Corp.*, 208 Md. 573, 581, 119 A.2d 423 (1956). There is no doubt that when Golden went out to see the Plaintiff at her house in mid to late April of 2007, he was "representing" Landco/Reecher "in contractual negotiations or transactions" and was acting as an agent for Landco/Reecher. The relationship between Golden and Reecher was not only that of principal and agent, it was that of employer and employee:

> Under the doctrine of respondeat superior, an employer is vicariously liable for the tortious conduct of an employee when the employee is acting within the scope of the employer-employee relationship. Converse to this doctrine is the general rule that an employer of an independent contractor is not vicariously liable for the conduct of the contractor. . . .
> . . .
> [T]he decisive test in determining whether the relation of master and servant exists is whether the employer has the *right to control and direct the servant in the performance of his work and in the manner in which the work is to be done.*

*Kersten v. Van Grack, Axelson & Williamowsky*, 92 Md. App. 466, 469-70, 608 A.2d 1270, 1272 (1992) (internal citations omitted, emphasis in original).

There's no question that Golden was employed by Landco/Reecher for the task of procuring homeowners' signatures on blank transactional documents created by Reecher that would be filled in by the Landco staff and signed and approved by Reecher later, and was not an independent contractor. On the witness stand at trial, the Defendant stated that he fully informed Golden of what needed to be explained to each homeowner he visited, thereby controlling and directing the performance of his work. Defendant even said that he checked with Golden later to make sure that he had explained everything in his meeting with Plaintiff, because he was apprehensive about the fact that she wasn't going to be receiving any money from the alleged

9

deal.[4] Thus, the method by which Golden was to procure the signatures and negotiate with the homeowners, was mandated and approved by Reecher. In his testimony, Reecher referenced a standard operating procedure that he had instructed Golden to follow, which would disclose the true nature of each of the documents the homeowners would be signing, and also the procedure used in Reecher's due diligence of first finding the loan amount, liens, encumbrances, or any other financial issue regarding the property before Reecher would commit to a project. He was clear in his testimony that he had trained Golden to follow this procedure and to use the documents provided. This constitutes Golden being subject to Reecher's control or right of control when conducting his operations on behalf of Landco/ Reecher, and thus necessarily qualify Golden as an employee, and *not an independent contractor* under *Globe Indemnity*.

Regarding the dichotomy of employee and independent contractor, other factors are inquired into by Maryland Courts in determining whether an individual is acting as an employee or an independent contractor, namely "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power of dismissal, and (4) whether the work is a part of the regular business of the employer."[5] *Kersten,* 92 Md. App. 466, 70, 608 A.2d 1270, 1272 (internal citation omitted). An application of these factors to the facts of this case all point to Golden being an employee of David Reecher. First, Reecher testified that he paid Golden through

---

[4] Yet, Defendant, who seemed to conduct himself as a meticulous person, never testified about making any effort, whatsoever, to contact the Plaintiff to confirm her acquiescence to the alleged "deal" with Landco. However, Defendant made the argument at closing that Plaintiff should have contacted David Reecher personally after her communications broke down with Eric Golden in the winter of 2007-2008, after her house was sold and Landco kept the proceeds, and after discovering, with the assistance of the Courts, what exactly had been done to her by Defendant's company.

[5] For further analysis, *see Butler v. PP&G, Inc.,* Civil No. WMN-13-430 (D. Md., August 6, 2013) (the relevant factors being: "(1) The degree of control that the putative employer has over the manner in which the work is performed; (2) The worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) The degree of skill required for the work; (5) The permanence of the working relationship; and (6) The degree to which the services rendered are an integral part of the putative employer's business."); *see also Lopez-Krist v. Salvagno,* Civil No. ELH-12-01116 *20-22 (D. Md. Oct. 17, 2013).

Landco a regular monthly payment of $10,000.00 which was the exact amount Reecher was receiving from Landco. Golden owned no stake in Landco, and there is no testimony that his compensation was commission-based, instead, his regular salary tends to show his status as an employee. Further, there is no question that Reecher, as President and sole shareholder of Landco, had at all times, the power to dismiss Golden for any reason he saw fit, thus satisfying the third *Kersten* factor, and it is an undisputed fact that Golden's "work [was] a part of the regular business" of Landco, which would satisfy the fourth factor, and thus supports Reecher's liability for Golden's torts done in the scope of his employment.

The final step is showing that Golden was acting within the scope of his employment when he visited Plaintiff's home in April of 2007. There is no doubt that Golden was acting on behalf of Landco, and acting pursuant to his employment duties under the guidance of Landco/Reecher when he procured Plaintiff's signatures on the blank transactional documents. As testified to, Golden identified himself as being with Chesapeake, wore a Chesapeake shirt, and gave Plaintiff a Chesapeake business card, all factors which bolstered Golden's credibility in the mind of Plaintiff. Under Maryland law, Reecher did not need to authorize Golden to go out and make fraudulent statements to Plaintiff to induce her to sign documents, nor did he need to "justify, or participate in, or indeed know of such misconduct, [and] even if he forbade the acts or disapproved of them[,]" *Sanders*, 61 Md. App. 40, 54, 484 A.2d 1030. Defendant Reecher would *still* be liable for the fraudulent acts of his employee acting in the course of his employment. *Id.* The policy justification is clear: if a business owner dispatches his employee into the public to act on behalf of himself or his business, under Maryland Law, and the law of each and every state, the principal is responsible for his agent's "fidelity and good conduct in all matters within the scope of the agency." *Id.; see also* RESTATEMENT (SECOND) OF AGENCY § 261

11

("A person who puts a servant *or other agent* in a position . . . to commit a fraud upon third persons is subject to liability to such third persons for fraud.").

### IV. DAVID REECHER'S ENTIRE DEBT TO PLAINTIFF "ARISES FROM" THE FRAUD SHOWN AT TRIAL, AND IS NON-DISCHARGEABLE UNDER § 523(a)(2)(A) AND DE LA CRUZ.

#### a. De La Cruz makes clear that "*any debt arising from fraud*" is non-dischargeable in Bankruptcy.

The language *"any debt"* was specifically chosen by congress to be included in § 523(a). 11 U.S.C. 523(a) ("this title does not discharge an individual debtor from *any debt*—"). The United States Supreme Court, in *Cohen v. de la Cruz*, was crystal clear in interpreting §523(a)(2)(a), holding that "***[o]nce it is established that specific money or property has been obtained by fraud, however, "any debt" <u>arising therefrom</u> is excepted from discharge.***" 523 U.S. 218, 221-22 (emphasis supplied).  As shown above, Plaintiff has established, by a preponderance of the evidence, that "specific money or property has been obtained by fraud." *Id.* There's no question that the Supreme Court chose its words very carefully, and their use of "arising therefrom" is clearly in line with their policy of discouraging fraud and offering a fresh start in bankruptcy only to "honest but unfortunate debtors." *de la Cruz*, 523 U.S. at 222; *Grogan*, 498 U.S. at 286-87, 290.

The operative verb "arise" as used by the Court in *de la Cruz* is defined by BLACK'S LAW DICTIONARY as "1. To originate; to stem (from)[.]" (Bryan Garner, ed. 8th Edition).  There can be *no doubt, whatsoever*, that each count of Plaintiff's judgment against Defendant *originated or stemmed* from the Debtor fraudulently obtaining specific money and/or property from Plaintiff.[6] The Complaint from which Plaintiff's judgments "arose out of" has been admitted in evidence. (Plaintiff's Exhibit 1, DCP-001 to DCP-029).  The facts alleged by the Plaintiff in her

---

[6] These counts were 1) Civil Conspiracy; 2) Intentional Misrepresentation; 3) Constructive Fraud; 4) Concealment & Non-Disclosure; and 5) Conversion.

12

Complaint *are the same facts and circumstances* that Plaintiff has shown at trial to be fraudulent. At the *Ex Parte* hearing before Judge Nichols, Plaintiff testified about the same facts and circumstances as she did before this Court at trial, albeit in lesser detail. (Plaintiff's Exhibit 3, DCP-037 to 061.)

The broadness of the terms "any debt" and "arising out of" make it clear: even though the required elements for each of the Plaintiff's counts necessarily vary to some extent, because judgment on these counts is undeniably stems and originates from Plaintiff's loss of her home upon the fraud of Defendant, *all of Defendant's debt to Plaintiff is non-dischargeable.* Congress *could* have narrowed the scope of 523(a)(2)(A) by stating that 523(a)(2)(A) would only render nondischargeable "debts for fraud judgments which have *identical* elements to the five common law elements of fraud as required by 523(a)(2)(A)," but Congress passed no such law. Instead, it followed the clear policy of favoring fraud victims instead of perpetrators, and required that of "any debt" which arises from fraud be non-dischargeable. *de la Cruz*, 523 U.S. at 222.

As explained by *de la Cruz,* "once it has been established" that a fraud occurred, <u>*any debt arising from such an act is non-dischargeable.*</u> It is the purview of this court to make the determination, using the preponderance of the evidence standard, of whether or not a fraud occurred between the parties, and if it has, to follow § 523(a)(2)(A), and the precedent of *de la Cruz* to determine that any debt arising from said fraud be non-dischargeable.

> **b. The United States Bankruptcy Court is not an appeals court for Maryland's judicial opinions, and it is an improper venue for any argument regarding legal error on behalf of Maryland's state courts.**

The United States Bankruptcy Court is not an appellate Court for Maryland's state courts, as Defendant attempted to argue at closing. As stated, in an adversary proceeding, this Court is tasked with determining whether fraud occurred, and if so, whether the debt in issue arose out of

said fraud. *de la Cruz*, 523 U.S. at 221-22.  The United States Bankruptcy Court is not charged with vetting Maryland's State Court Judgments for legal errors, such as the ones concerning punitive damages and ex parte proof as improperly and groundlessly argued by Defendant at closing.  Maryland, like every other state, already has in place a robust appellate system which Defendant undeniably has full and complete access to.  Defendant's argument that his alleged issues with prior counsel have precluded him from appealing the case is an argument best heard in the appropriate state court of Maryland, not before this United States Bankruptcy Court.  However, despite having that opportunity as was recommended by the late trustee Michael Rinn, Defendant Reecher refused such an offer and elected to litigate his case in this forum rather than the Maryland state court as is evident from the record in the bankruptcy estate proceedings.[7]

### c. Having *never* been asserted by Plaintiff, and the factual issues having been fully litigated, collateral estoppel is entirely moot.

Collateral estoppel is also known as "issue preclusion."  The only issues before this court are whether or not Defendant committed a fraud upon the Plaintiff, and whether or not the Defendant's debt to Plaintiff arose out of such fraud. *de la Cruz*, 523 U.S. at 221-22.  Collateral estoppel is a method by which relitigation of factual issues is precluded by a prior judgment concerning said facts which was actually litigated.  In other words, Plaintiff could have asserted by a Motion for Summary Judgment, shortly after filing her Complaint in this Court, that Defendant was collaterally estopped from litigating the issue of fraud on the basis of the Judgment from Prince George's County on this issue.  Plaintiff filed no such motion, and instead this issue was fully and fairly litigated before this Court through a seven day trial.

---

[7] The late Michael Rinn, Esq., aptly stated in his Motion to Dismiss Defendant's Bankruptcy case that "*the primary substantive issues involving the debtor . . . are more properly issues within the jurisdiction of the Circuit Court for Prince George's County rather than this Court.  **Further, these proceedings were filed [by David Reecher] in bad faith if not actually on a fraudulent basis[.]***" (*See* Bankruptcy Doc. No. 54 (emphasis supplied).)

14

At closing argument, Defendant inaccurately argued that two cases dealing with collateral estoppel stand for the proposition that "it's like the [judgment at issue] never happened." These two cases, *In re Raynor* and *In re McClendon*, both only deal with the issue of collateral estoppel in relation to Motions for Summary Judgment.  However, Plaintiff has not once asserted such a claim, and instead has fully litigated the issue of fraud, and thus the issue is moot.  Defendant inaccurately describes the holdings of these cases, as the *In re Raynor* Court determined that collateral estoppel should not apply, and ordered that a full evidentiary hearing be conducted on the issue of fraud, 922 F.2d 1146, 1150 (4th Cir. 1991), and the *In re McClendon* Court determined that collateral estoppel did not apply and therefore "the debtors were not collaterally estopped from contesting this action." 415 B.R. 170, 182 (Bankr. D.Md. 2009).  Later, after fully litigating the facts, which were completely different than the facts presently before the Court,[8] the McClendon Court found for the debtor and allowed discharge. 415 B.R. at 182-84, 186.  In this litigation, Plaintiff has <u>never</u> attempted to prevent Defendant from contesting the facts in this action, and Defendant indeed used this forum to contest the facts through cross-examination and his case-in-chief.  Now that the facts have been litigated, collateral estoppel, which has never been asserted by the Plaintiff, and is not being asserted now, is a completely moot point.

## V. CONCLUSION:

Having shown, by a preponderance of the evidence, that Plaintiff suffered a loss due to Defendant's fraud, and that Plaintiff's state court judgment against Defendant arose out of this fraud, this Court should determine that Defendant's entire judgment debt to Plaintiff be deemed non-dischargeable in Bankruptcy, pursuant to § 523(a)(2)(A) and authority detailed herein.

---

[8] Contrary to the circumstances of the case before this Court, in *McClendon* the debtor was an unsophisticated former homeowner who owed contractual debts to a sophisticated real estate businessman who was the plaintiff in the adversary proceeding.

15

        Respectfully submitted,

        _____/s/_____
        Law Offices of Joseph H. Ostad, P.A.
        By:  Joseph H. Ostad #08127
        401 E. Pratt St.
        Suite 2233
        Baltimore, Maryland 21202
        (410) 727-6116
        jostad@verizon.net

## **CERTIFICATE OF SERVICE**

  I HEREBY CERTIFY that on this 13th day of November, 2013, a copy of Plaintiff's Post-Trial Legal Memorandum was mailed, postage prepaid to:

| | |
|---|---|
| Steven A. Allen, Esq. | Monique D. Almy, Esq. |
| 901 Dulaney Valley Road, Suite 400 | 1001 Pennsylvania Avenue NW, 10th Floor |
| Towson, MD 21204 | Washington, DC 20004 |
| *Attorney for David Reecher* | *Trustee* |

*Office of U.S. Trustee*
101 W. Lombard St., Room 2650
Baltimore, Maryland 21201


        _____/s/_____
        Law Offices of Joseph H. Ostad, P.A.
        By:  Joseph H. Ostad #08127
        401 E. Pratt St.
        Suite 2233
        Baltimore, Maryland 21202
        (410) 727-6116
        jostad@verizon.net